The evidence in this case being wholly circumstantial, it is insufficient to sustain the verdict.
 DECIDED NOVEMBER 5, 1949.
Bert Weehunt was convicted of possessing non-tax-paid whisky. He filed a motion for a new trial, which was overruled. On this judgment he assigns error here.
Substantially, the evidence for the State reveals: Sam Holcombe testified that he was a revenue officer and in his official capacity on February 20, 1947, with a search warrant for the defendant's premises, went to the defendant's home. He was *Page 369 
accompanied by several other officers. Across the public road in front of the defendant's home they found 65 gallons of non-taxpaid whisky under the bank of a ditch that started on a roadside and went down in front of the defendant's house. Directly in front of the defendant's home, across the road approximately 60 yards further away from his home, they found 64 additional gallons in "tow sacks." The ground was wet. The officer followed the tracks in the defendant's yard, and across the road, and there was a path up the bank nearly in front of the defendant's driveway. Below, there was a field road that went by the edge of the bottoms. Fresh tracks were followed from the defendant's home to where the whisky was found. The witness had been to the defendant's home on different occasions. The premises where the whisky was found were the premises the defendant had been occupying and using. The defendant had been there some time formerly. He worked part of the land below where the whisky was found. "There is no indication of any line there." The whisky was found in the woods between the bottom land and the defendant's home. The statement that the defendant made was that he controlled some of the bottom land on the opposite side of the road and some of the land was on the side of the road where the dwelling house was located. The defendant was at home the day the officers searched the premises. The witness saw most of the defendant's family at the defendant's home. From the place where the whisky was located it was probably a half a mile to the house of any other person. Some of the officers searched the home and in a room they found a good many stacks of cans in sacks. There were five cans to the sack. They were not examined for any odor. The cans found in the home were the same type of cans found with the whisky in them. When the searching party found the cans in the home, on discussion as to what should be done with the cans, the witness informed them that there was nothing that they could legally do, since the possession of the cans was legal. They left the cans in the home. They destroyed the whisky which was found. The witness did not remember that it had rained the day the search was made, but the ground was wet and was easy to track. As to whether the officers found tracks leading to the whisky, the witness testified that there were a good many wagon *Page 370 
tracks which came out of the defendant's driveway onto the public road and the road from the home to where the whisky was found crossed there. Part of the tracks had been run over by automobiles. The officers continued to follow the tracks across the public road and up the bank. The dirt was red in the defendant's yard. The persons who made the tracks around the home got mud on their feet, and, across the public road from the same tracks, one could see a little red mud on the pine straw. The tracks were followed to where the whisky was found. From where the first batch of whisky was found the tracks were followed to the second batch. On cross-examination this witness testified that the defendant's home was located approximately 20 to 30 yards from the public road. The witness testified that there is a driveway up towards the Gainesville highway in front of the defendant's home that comes into his back yard, and also a driveway which goes by the side of the defendant's home straight into that public road. The land directly in front of the defendant's home is not cultivated, open land. Where the whisky was found, the land was woodland. It was a pine orchard. The land was all lying out, and briars and grass were thereon. The whisky was concealed in a "cut." There was a field road that went around the edge of the woods and the bottom land. The officers went around this road "a good long ways." The defendant told the witness that the defendant worked some of the bottom land. This statement was made to the officer about a year or more before the trial. The defendant has both grown boys and grown girls. They had been seen working across the road from the defendant's home (the time that the witness saw them working is not given). The witness does not know which of the children lived with the defendant. The witness could not testify as to who was in charge of the land across from the defendant's house, nor who was in possession of it. Regarding the cans which were found in the home of the defendant, the witness testified that they were just plain one-gallon tin cans; that all such cans look about alike; that it is possible that there might be a million more or less of the same kind of cans and that in nearly all whisky raids, cans similar to the ones found in the defendant's home are found; that it is possible that a raid might be made across the county and cans similar to those found in the *Page 371 
defendant's home and those which contained whisky might be found.
L. N. Chadwick, the sheriff, testified corroborating in part and not contradicting any part of the testimony of the witness Holcombe, and in addition, on cross-examination testified, that at the time and place where the whisky was found the officers did not chase anyone from that point, but that they did chase away from the defendant's home two other men for whom the officers had warrants, the names of these men being Junior Weehunt and a Roper boy. The officers had been hunting for these other two men for some time; both of them were in their early twenties. The two men came out of the defendant's home and started running and some of the officers chased them toward the river. The sheriff further testified: "Q. Was this liquor found on the same farm that he [meaning the defendant] lives on? A. Well, I wouldn't say about that. Q. Now, sheriff, you don't know a thing about whether the bottom land across the road was on Weehunt's [meaning the defendant's] farm or not? A. Well, I don't know whose land it is on. Q. You don't mean to tell Hope [meaning the solicitor] that that bottom land on that side of the road between the liquor and the road was under the charge of Bert Weehunt [meaning the defendant]? A. No, I wouldn't know." The witness testified that, when the two men ran from the defendant's home, the defendant did not say that the whisky belonged to either of the men who ran away; that the defendant didn't say anything.
H. H. Cofer testified substantially: that he was with the raiding party and that he did not know who was in possession of the premises where the whisky was found. He further testified that upon following the tracks in question in the direction where the whisky was located there was no solid path. Before the path reached the place where the whisky was found "it scattered out across the woods."
L. J. Crow testified: that he was with the searching party and saw the whisky after it was found and testified further that he was familiar with the premises where the defendant lives, that is, that he was familiar with the house and premises where the defendant lived, but he did not know what land he was in charge of, and did not know who owned the land across the road where *Page 372 
the whisky was found nor who was in possession of it. The defendant made the following statement: "Well, I don't know anything about that liquor, it wasn't on land I live on. The officers came over there and got me and carried me over there and cut part of it and wanted me to go on and I told them I didn't know anything about it and I wasn't going with them and I come on back to the house."
It will be observed that the verdict is based wholly upon circumstantial evidence, as will be seen from the evidence introduced by the State. This being true, we do not think it is sufficient to exclude every other reasonable hypothesis save that of the guilt of the accused. See in this connection Thomas v. State, 65 Ga. App. 26 (14 S.E.2d 610); Oliver v. State, 65 Ga. App. 35 (14 S.E.2d 609);Newberry v. State, 66 Ga. App. 176 (17 S.E.2d 605);Roper v. State, 67 Ga. App. 272 (19 S.E.2d 746). The facts in the case of Aikens v. State, 57 Ga. App. 535
(196 S.E. 263), relied upon by the State, to sustain the conviction of Weehunt, are so different from the facts in the instant case that we do not think the Aikens case is authority for sustaining the verdict and sentence of the lower court in the instant case. The evidence is not sufficient to sustain the fact that the contraband whisky was found on the premises which were owned or in the possession of the defendant. The evidence is positive that the defendant with his family lived in the home, but the evidence is silent as to whether the son of the defendant and Roper, who fled from the home of the defendant when the officers approached, lived there or not. If they did live there, then the question of joint occupancy would be involved.Summerville v. State, 66 Ga. App. 61 (17 S.E.2d 82).
In the whole view of the case, the evidence is insufficient to sustain a conviction.
Judgment reversed. MacIntyre, P. J., and Townsend, J., concur. *Page 373